[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
By complaint dated June 8, 1999, the plaintiff wife, Annmarie Hope, commenced this action seeking a dissolution of marriage on the ground of irretrievable breakdown and other relief. The defendant husband, through counsel, filed a cross-complaint on August 18, 1999 seeking similar relief. Pendente lite orders were entered on September 1, 1999 requiring the husband to pay $154.00 per week to the wife for support of the minor CT Page 5728 children. That amount was modified on October 17, 2000 pursuant to an agreement and based on the husband's increased income.
On November 3, 1999, the parties agreed to joint custody of the four minor children, primary residence of Shane, Patrick and Nicholas with the wife and primary residence of Dale with the husband. A visitation schedule was agreed upon as well with exchanges of the children to take place at the Granby Police Station. On March 8, 2000, counsel was appointed for the minor children. The defendant filed a pro se appearance on January 30, 2001.
The parties intermarried on February 14, 1991 in West Springfield, Mass. The wife has resided continuously in the state of Connecticut for at least twelve months prior to the filing of this action. All statutory stays have expired. The wife had one child at the time of the marriage, Dale Anthony Hope, born August 18, 1987. Dale was subsequently adopted by the husband. The parties have had three minor children born to the wife since the date of the marriage: Shane Ryan Hope, born June 15, 1991; Patrick Lee Hope, born November 23, 1992; and Nicholas Jacob Hope, born December 4, 1996. No other minor children have been born to the wife since the date of the marriage. No state or municipal agency has or is contributing to the support of the parties or their minor children.
The plaintiff wife is 34 years of age and has an 11th grade education, is taking GED courses and hopes to become a medical secretary. She indicates no health problems. She has worked outside the home less than one half of the marriage. During the marriage, the parties agreed that the wife would care for the children in the home.
The husband is 36 years of age and has a 10th grade education. He has worked for AMTRAK since 1991. In 1999, he earned $51,000 including bonuses. In 1998, he earned $48,000 including bonuses. Recently he was suspended from his job without pay and he is not optimistic with respect to reinstatement with AMTRAK. He has earned a pension with the railroad. He plans to earn his GED. He is also a volunteer fireman. With respect to his health, he testified to having had a heart attack.
The parties have resided at the home of the maternal uncle since 1995 in a living arrangement where the parties were required to pay for food, to cook, to clean, to do the laundry and to care for the great-uncle in exchange for no rent and upkeep of the premises. The uncle required that the husband and wife quit smoking in exchange for $10,000.00 each which they were paid. Ultimately, the uncle plans to give the house to the wife in a living will.
The children are classified as "special needs" to varying degrees. They CT Page 5729 are seen periodically at Brightside by Colleen Kubish, a psychiatric clinical nurse specialist who is under the supervision of a psychiatrist. Ms. Kubish did not appear for trial but did provide a letter which was admitted without objection. Shane has been diagnosed ADHD, attends a counseling center at Brightside and is on 15 mg's Dexadrine in the morning and 1 mg Tenex in the evening. Patrick had been diagnosed as ADHD, ODD, and obsessive-compulsive disorder, and is on 15 mg's Aderol in the morning and 1 mg Tenex in the evening. He also has a cleft lip and palate, has had numerous surgeries, will require additional surgery, wears eye glasses and has had four sets of tubes in his ears. He is scheduled for a bone graft between August and October, 2001. Dale is on 15 mg's Aderol in the morning and 5 mg's Aderol at noontime.
The wife has been available to the children during the daytime and evening hours because she doesn't work outside the home; she participates in their school activities and conferences and brings them to their medical appointments. The husband has also been involved in the children's activities but to a lesser extent. He conceded at trial that he was "not there much" during the first six months of Patrick's life but that he has been present for most of his life and for the other children and wants to be there forever.
The parents have had a major difference of opinion with respect to whether the children need to be on medication on weekends when they are in the care of their father. The husband is very concerned about the medication that his children are on. He believes that they are being over medicated and does not feel the need to medicate the children on weekends when they are with him. He indicated that he does not have any problems with the children behaviorally when they are with him. The wife testified that the children are difficult for her to control when they return to her home after a weekend with the husband having been on no medication. She testified that because the drugs are narcotics, the children need to be on them seven days a week. The court does not find this testimony to be persuasive.
The husband testified that the children do fine on the weekends when they are in his care without the medication. The wife testified to her difficulty controlling the children after they leave the husband's home. There was no evidence, including the exhibits, presented by either party that it is presently in the children's best interests to medicate them on weekends. In fact, even the exhibit evidence of letters dated 10/22/1999, 6/6/2000, and 3/7/2001 from Colleen Kubish, a psychiatric clinical nurse specialist, indicated that it was not clear to her that omitting medications on weekends was compounding the children's difficulties. The court is however, convinced that the wife has difficulties controlling the children when they are in her care. CT Page 5730
With respect to visitation, the parties have had some major difficulties during visitation. The exchange of the children has taken place at the Granby Police Station. The parties agree that the children enjoy their visits with the husband. The wife has occasionally held back visitation from the husband on Tuesdays and Thursdays with respect to Nicholas for a variety of reasons. She has also curtailed his visits on occasion because of her claimed safety concerns. She cited as examples that on one occasion, Nicholas scraped his side with a stick and on another occasion all of the children got poison ivy while in their father's care. The court is not persuaded that the children are at risk or are improperly supervised while in the husband's care.
The husband has safety concerns for his children with respect to "Tom" the mother's boyfriend. According to him, Patrick has indicated that he has been pulled out of bed and threatened and harassed by "Tom." In addition, the father testified that the mother has canceled visits with Dale with little notice in order to spend more time with her boyfriend. Tom has said to Dale, "your father is no f---- hero, go live with him, you don't love your mother." The court has concerns about the quality of parenting being provided to the children by the wife's boyfriend and the wife's judgment in allowing such treatment.
According to the children's attorney, Dale's contact with his mother is sporadic and he is aware of "Tom's" part in the break-up of his parents marriage. He has stated "I have lost one dad, I don't want to learn another." Patrick has indicated at times that he wants to live with his father because it would be more fun. He is sensitive and shy and wants to live with his dad where it is not "loud". The other three boys are envious of Dale because he gets to spend so much time with his dad. All of the children are aware of what is going on with their parents and feel the repercussions of relaying problems about one parent to the other parent. The children have reported other parties listening in on the telephone calls when they talk to their father. The children have indicated to their attorney that they want to stay in the same school and neighborhood but also want more time with their dad.
With respect to causes for the divorce, the wife claims to have been mentally and physically abused by the husband in the marriage. The court does not find this claim to be credible. First, the sole complaint made to the police by the wife (the husband grabbing her arm) was ultimately nolled. In addition, the wife's statements to police in June 1999 contained in plaintiff's exhibit #8 contradict her claim and reflect that there had been no violence in the marriage up to that one incident.
The court finds credible the husband's testimony and statements made to CT Page 5731 the police in June of 1999 which indicates that he found his wife writing sexual messages to someone on the Internet in early 1999. Thereafter, there were unexplained telephone calls made to Minnesota by the wife. The husband was asked to leave the home by the wife on May 1, 1999, and on May 6, 1999, a man (Tom Tressler from Minnesota) was observed by the husband through a window in the home. The husband observed a truck and Harley Davidson Motorcycle with Minnesota license plates in his driveway soon thereafter when Mr. Tressler moved into the family home. Plaintiff's Exhibit #8 also establishes Mr. Tressler's presence in the plaintiff's life when she gave statements to the police in June 1999. The court finds the cause of the divorce not to be the conduct of the husband but rather primarily the conduct of the wife.
The testimony established that in July of 1999, the oldest child Dale was "kicked out" of the mother's home because the boyfriend didn't like him and he has been living with the husband ever since. The husband also resides with his girlfriend. He pays rent to his aunt who owns the home he lives in and hopes to eventually buy the home from her. According to the father, he has concerns for his sons' safety because of the group he believes that the boyfriend is affiliated with. He believes this because he has been threatened by the mother's boyfriend with retaliation by Hell's Angels. He also testified that Patrick told him about being pulled out of bed by "Tom" and harassed and threatened by Tom. He has complained to the police and to DCF about his concerns.
The parties own a time share which the husband was paying for until he discovered that the wife and her boyfriend were using it.
The husband testified and the court finds credible that his mother bought the boat and trailer for $1750 and that money, as well as the $100 rebate check, were used to pay the bill for the attorney for the child.
Since March 8, 2000, the husband has been unemployed. The court finds that the earning capacity of the plaintiff is, at present, $10.00 per hour and that of the defendant to be $8.00 per hour. The husband is less educated than the wife and it is clear to the court that based on the husband's testimony and his recent dismissal from his AMTRAK job, at the present time, he has no employment advantage over the wife in pursuing another position in his prior field.
The court has considered all of the statutory factors concerning custody and visitation set forth in Connecticut General Statutes Secs.46b-56, 46b-56a, and 46b-59. The court has further considered all of the factors in Connecticut General Statutes Secs. 46b-81, 46b-82, 46b-89, and46b-62 and other pertinent statutes, earnings, and earning capacity differentials, causes for the breakdown of the marriage and the CT Page 5732 consequences of the financial awards set forth below. Judgment shall enter dissolving the marriage of the parties on the ground of irretrievable breakdown. It is further ordered that:
1. Custody
a. The court simply does not have enough information with respect to the children's behavioral issues to render an informed decision with respect to custody or medication requirements of the children. Therefore, the court shall defer any permanent custody or visitation order until a child or adolescent psychiatric evaluation with psychopharmacology review is conducted with respect to Nicholas, Shane, Patrick, and Dale by Dr. David Krulle, M.D. The parents are to arrange for the evaluations immediately and a report is due back to the court by May 31, 2001. The evaluations shall be conducted at state rates.
b. In the interim, the parents shall have joint custody of the minor children, primary residence of Dale to be with the husband; primary residence of Shane, Patrick, and Nicholas shall be with the wife until the end of the school year. The children who reside primarily with the wife shall spend three weekends per month with the husband from Friday after school to Sunday at 7:30 P.M. . Dale shall spend one weekend per month with the wife and any other time that Dale wishes or can be agreed upon by both parties. Nicholas shall spend an additional period of time with the husband from 8:30 a.m. until 11:15 a.m. prior to his school day as the husband's work schedule allows. The husband shall also be permitted contact with Shane and Patrick during the week as his employment schedule will allow.
The parties may agree to any other parenting time for both parents, in excess of the above-mentioned times, taking into consideration the needs and availability of the minor children. The exchanges of the children shall continue to occur at the Granby Police Station. The wife's boyfriend shall not be present at any of these exchanges unless agreed upon by the husband. Any modification of the parameters of these exchanges must be by the agreement of both parties or by further order of the court.
c. Each of the parents shall continue to have a full and active role in providing a sound ethical, economic, and educational environment for the children. These powers shall not be exercised for the purpose of frustrating, denying, or controlling in any manner the social development of the children by the other parent. The parents shall exert their best efforts to work cooperatively to develop future plans for the children consistent with the best interests of the child and to amicably resolve such disputes as may arise from time to time. CT Page 5733
d. Recognizing the abiding need for the maintenance of a sense of dual parenthood for the benefit of the children and recognizing the deep and abiding love that each parent has for the children, the parties shall work together to maintain free, open and unhampered contact between the children and the parents.
e. Each of the parties shall allow the children to maintain free access with the other parent when the children are in residence with them, and foster a feeling of affection between the children and the other parent. Neither parent shall do anything that will estrange the children from the other parent, which will injure the opinion of the children as to the other parent or which will impair the natural development of the childrens' love and respect for each of the parents.
2. Child Support
Until the next court date, the husband shall pay child support to the wife in the amount of $100.00 per week. Such amount is a deviation of the strict application of the child support guidelines and is based on the children's best interests, other equitable factors, and the husband's recent job loss. The court shall reconsider this child support order once a permanent child custody order is made and each parents' employment status is clarified.
3. Medical insurance and Unreimbursed Expenses
a. Each party shall be responsible for their own health insurance and unreimbursed medical expenses.
b. Each party shall be responsible for providing medical and dental insurance for the benefit of the minor children as available through their place of employment and at reasonable cost to them. They shall apply for benefits through the Connecticut Husky Program if such benefits are not available or are unduly burdensome through their place of employment. The parties shall share equally any co-pays and unreimbursed medical and dental expenses for the children.
4. Life insurance
Each party shall obtain and maintain $100,000.00 in life insurance naming the other as sole trustee for the benefit of the minor children until they reach the age of majority.
5. Property division
CT Page 5734
a. Alimony
The court orders that each party pay $1.00 per year in alimony to the other for a period of 5 years. The alimony shall be non-modifiable as to term.
b. Pension
The wife shall receive 30% of the husband's pension at AMTRAK which shall be facilitated with a Qualified Domestic Relations Order, valued as of the date of this decision.
c. Personal property
The chainsaw and the video camera shall be returned to the wife. The husband shall retain possession of the stereo. The jeep, van and thunderbird shall be sold with the proceeds divided equally. The timeshare is awarded to the husband and shall be his sole financial responsibility. The court heard no testimony with respect to the television, the armoire, the dresser, the children's tent or the Polaroid pictures and will therefore make no order with respect to those items. The husband testified and the court finds credible that the proceeds from the boat and trailer paid allowable attorney's fees and will make no order with respect to those proceeds.
d. Taxes
Each party shall divide the children as income tax exemptions as follows: the husband shall take Dale and Nicholas, the wife shall take Shane and Patrick. The parties shall file a joint 2000 tax return and each party is entitled to one half of the refund or is responsible for one half of the tax liability, if any.
6. Liabilities and Debts
a. Each party is responsible for their own attorney's fees. The court's prior order with respect to attorneys fees shall stand.
b. Each party shall be responsible for 50% of the Sears credit card debt and the husband will be responsible for any debt associated with Fingerhut and the alarm system. The husband shall be responsible and continue to pay on the amount due to Dr. Ira Green, Patrick's dentist. Each party shall be solely responsible for the remaining debt listed on their financial affidavits.
Prestley, J. CT Page 5735 thru CT Page 5740 are blank
CT Page 5741